# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 13, 2013

## STATE OF TENNESSEE v. JOEY WALTON

**Appeal from the Criminal Court for Shelby County**
**No. 12-03073      J. Robert Carter, Jr., Judge**

---

**No. W2013-00655-CCA-R3-CD  - Filed February 19, 2014**

---

The defendant, Joey Walton, was convicted by a Shelby County Criminal Court jury of aggravated rape, a Class A felony; false imprisonment, a Class A misdemeanor; aggravated sexual battery, a Class B felony; and especially aggravated kidnapping, a Class A felony. The trial court merged the false imprisonment count into the aggravated rape count and sentenced the defendant as a violent offender to twenty-two years for the aggravated rape conviction, fifteen years for the especially aggravated kidnapping conviction, and twelve years for the aggravated sexual battery conviction. The court ordered that the aggravated rape and aggravated sexual battery sentences be served concurrently to each other but consecutively to the especially aggravated kidnapping sentence, for an effective sentence of thirty-seven years at 100% in the Department of Correction. The defendant raises three issues on appeal: (1) whether the trial court erred by denying his motion to suppress his statement to police; (2) whether the trial court properly admitted a police officer's testimony about his conversation with the defendant; and (3) whether the evidence is sufficient to sustain his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal), Nigel Lewis and Michael J. Johnson (at trial), Assistant Public Defenders, for the appellant, Joey Walton.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Abby Wallace and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

According to the State's proof at trial, at approximately 8:00 p.m. on January 20, 2012, sixteen-year-old Memphis resident, S.K.,[1] was walking home from an Orange Mound neighborhood grocery store with her two-year-old cousin, C.H., when a man first asked her how old she was and then began following her home, telling her somewhere along the route that she looked "sexy." As the victim[2] and her young cousin neared their home, the man grabbed C.H. and began dragging her behind a neighborhood abandoned house. S.K. followed them in an attempt to free C.H. When they were behind the house, the man pulled down S.K.'s pants, licked her vagina and her anus, rubbed his penis against her breasts, forced her to rub his penis with her hand, inserted his finger into her vagina, and inserted his penis into her anus. After a media alert was issued with the defendant's image from the store surveillance tape, the defendant turned himself into the police, where he gave a statement denying any sexual contact with the victim. The Shelby County Grand Jury subsequently indicted him for the aggravated rape of S.K., the aggravated kidnapping of S.K., the aggravated sexual battery of S.K., and the especially aggravated kidnapping of C.H.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress his statement to police, arguing that it was the product of an illegal detention and coercive police tactics. At the suppression hearing, Sergeant Sharon Birk of the Memphis Police Department's Sex Crimes Bureau, who interviewed the victim at the Shelby County Rape Crisis Center on the evening of the attack, testified that the victim told her that a man approached her at the store and offered her $20 "to engage in a sex act." The victim refused, telling the man that she was only sixteen years old, and walked away. The victim said that the man followed her, grabbed her and her two-year-old cousin, and took them behind a vacant house. There, the man forced her to engage in manual stimulation, licked her genitals, and forced penile-anal sexual intercourse with her. The victim also related that she went home after the rape and told her parents what had happened to her and that they returned to the store and confronted her rapist. Sergeant Birk testified that the victim's physical examination revealed abrasions and anal tearing that were consistent with her account of forced sexual intercourse.

---

[1]It is the policy of this court to refer to minor victims of sexual assault by their initials only.

[2]Although there are two victims in this case, we will, for simplicity's sake, refer to the rape victim as "the victim" and C.H. by her initials.

Sergeant Birk testified that the next afternoon she reviewed surveillance videotape from the store, on which she identified a man who fit the description provided by the victim and her parents. She said another officer, Officer Craig, canvassed the neighborhood with still photographs from the surveillance videotape and located an individual who did not know the defendant's name but was able to point out the defendant's uncle's house. Officer Craig then spoke to the defendant's uncle, who identified the defendant. At about the same time, photographs from the surveillance tape were released to the media.

Sergeant Birk testified that on January 24, the victim, the victim's uncle, and the victim's parents positively identified the defendant from a photographic lineup she had prepared with the defendant's photograph. The previous day, the defendant, perhaps in response to the media release, came to the police department and turned himself in. On January 24, she informed him of his rights, and he waived his rights and gave her a statement about the January 20 incident with the victim.

On cross-examination, Sergeant Birk acknowledged that she knew the identity of the alleged perpetrator before the defendant turned himself in. She further acknowledged that the defendant was not immediately arrested but was instead placed on a forty-eight-hour hold. She conceded that the victim and her family members made their identifications after the defendant turned himself in and before she took his statement and that she informed the defendant of the results of the photographic lineup identifications. She said the defendant was formally arrested and charged within an hour or two after he had given his statement, at no later than 6:00 p.m. on January 24. As she recalled, the defendant turned himself in sometime during the late evening hours of January 23, which meant that he had spent the night in jail before giving his statement. Finally, she acknowledged that the Memphis Police Department's policy had changed since the time of the defendant's detention and arrest, in that they were no longer allowed to take a person into custody without a formal charge.

Sergeant Steve Kent of the Memphis Police Department, who worked the felony response evening shift, testified that at approximately 10:30 p.m. on January 23, he was assigned to meet a man outside the jail who wanted to turn himself in. He said that the defendant was standing with a woman on the other side of the street from the jail when Sergeant Kent first noticed him and that he crossed the street to where Sergeant Kent was standing with a fellow detective, identified himself as the defendant, and said that he was there to turn himself in. The defendant also said that "some girl was trying to put something on him" and he "just wanted to get this cleared up." Sergeant Kent testified that he and his fellow detective patted down the defendant, placed him in handcuffs, and took him upstairs to the felony response unit. Once there, he notified his supervisor that the defendant was in custody and that he would hold him until felony response was able to contact the investigating officer on the case. Sergeant Kent explained that he detained the defendant

rather than placing him under formal arrest because the case was not assigned to the felony response bureau:

> Well, if we're assigned a case, we prepare that case. There's – none of the dayshift bureaus work at night, so felony response is the bureau that handles anything that walks in the door at night. And this wasn't my case or any of the felony response detectives, and so, we just hold that person until we can get a[] hold of the detective who is responsible for that case.

On cross-examination, Sergeant Kent testified that another officer transported the defendant before a magistrate in order to get the forty-eight-hour hold placed on him. He said he never spoke with Sergeant Birk that night.

At the conclusion of the hearing, the trial court found that the defendant's statement was voluntary and that probable cause existed for his arrest at the time the forty-eight-hour hold was placed on him. The trial court, therefore, overruled the motion to suppress the statement.

## Trial

The State's first witness at trial was the girls' grandfather who testified that on the evening of January 20, 2012, he gave the victim some money and permission to take C.H. with her as she walked to the corner grocery store to buy snacks. When the girls did not return when he expected, he became worried and went outside to the front yard to look for them. At some point, they came home and S.K. immediately went inside and upstairs. Next, C.H.'s father, who also was S.K.'s uncle, came running downstairs, and he and S.K. left the house. The girls' grandfather said he remained behind in the front yard with C.H. who said to him, "[G]randdaddy, he made me cover my eyes up like this," as she demonstrated for him. On cross-examination, the witness acknowledged that there was a lot of foot and vehicular traffic on his street and in the area around the grocery store.

The sixteen-year-old victim, S.K., testified that she was walking home with C.H. from the corner grocery store when a man outside the store twice asked her how old she was. She said she did not respond the first time, but when he repeated his question she told him she was sixteen. He told her she looked older, and she asked him how old he was. He answered "thirty to thirty-five." The victim made a positive courtroom identification of the defendant as the man who approached her outside the store.

The victim testified that she was wearing long shorts that fell below the knees and a long-sleeved, high-necked t-shirt. She stated that she and C.H. continued walking down the

sidewalk toward home and that the defendant fell into step on the street beside them, telling her that her body looked "sexy." She and C.H. kept walking, and the defendant kept up with them but did not say anything else. She and C.H. started crossing the street, and the defendant grabbed C.H. by the collar and began dragging her behind an abandoned house down a side street. She followed trying to get the crying C.H. away from the defendant. Once behind the abandoned house, the defendant placed C.H. on a step and began trying to pull S.K.'s shorts down, while she kept pulling them back up.

The victim testified that the defendant finally succeeded in pulling her shorts down. She said he bent her over and "started licking [her] butt." At the same time, he put his finger inside her vagina, which "[f]elt awful." He then "stuck his [penis] in [her] butt" and moved his body back and forth, hurting her. At some point, C.H. got off the step and tried to run away, but the defendant caught her and placed her back on the step. The defendant then placed the victim on the ground and "repeated hi[m]self," inserting his penis inside her anus and rectum again. When he was finished, she got up from the ground, and the defendant pushed up her shirt and bra, pulled her breasts out, put his penis between her breasts, and made her move her breasts up and down. The victim testified that the defendant at some point also told her to "jack him off" and forced her to rub his penis with her hand. The defendant also ordered her to spit on his neck and lick it off and to "suck his thing" but she refused.

The victim testified that the defendant finally let her and C.H. go after he asked her what that smell was and she informed him that C.H. had defecated. She said that the defendant offered her a bag of marijuana and $20 before she left, but she refused and ran home with C.H. The victim stated that she did not want the defendant's money or marijuana and that she never agreed to do anything with him "for anything."

The victim testified that the first thing she did upon reaching home was call her father to tell him what had happened. She then told her uncle, and he and she started walking back to the store so that she could point out the defendant to him. En route, her father and stepmother picked her up and took her the rest of the way to the store, where she pointed out the defendant to her family. When she did so, the defendant said, "[T]hat b**** asked me for twenty dollars to suck my d***." The victim said her father reacted by swinging at the defendant, and the defendant responded by reaching toward his back pocket as if he had something in it before running out of the store. The victim testified that she was sore and had blood inside her shorts after the rape.

On cross-examination, defense counsel questioned the victim about various minor inconsistencies between her trial testimony and her previous statement to police. On redirect examination, the victim acknowledged having given the following account of the rape to the

detective at the Rape Crisis Center on the night of the attack:

> I asked my granddad for a snack. We went to the store. Me and my little cousin, [C.H.], she's two years old. I came out of the store and the man asked how old I was. I told him I was sixteen and he said, oh, I thought you was older.
>
> I then tried to ignore him and I was walking to the corner I was going to cross. He grabbed me and my little cousin. He took me to the abandon[ed] house. I tried to get away and he yanked me and my little cousin.
>
> He took us to the back of the outside in the backyard. He gave me a blunt and I told him I didn't want this. He tried to give me twenty and then he yanked my shoulder. My cousin started hollering, he told me to shut up. I told him we didn't need to be here.
>
> Then he pulled my pants down. I tried to pull them back up. He yanked me. He bent me over and he squatted down behind me and he kissed my booty and licked me between my legs. Then my cousin tried to get away again, he yanked her. And he put me on the ground and he kissed my booty again and he licked between my legs again. I tried to get away. I – and he had taken his pants. He had took my hand and told me to jack him off until he nut. He told me to spit on his neck and lick it off.
>
> When I tried to get up he told me to suck his d*** and I told him I don't do that and I'm not fixing to do you. He asked me . . . who was that and I told him it was my daughter and we got away and ran to the house.

The victim acknowledged having been asked that night whether the defendant had penetrated her vagina, and having answered that he had put his finger inside her vagina and his penis inside her "booty" and told her that her "stuff was good."

The victim's uncle testified that when his daughter returned from the store with the victim, she came upstairs and began telling him that somebody had been "messing" with S.K. He said he then went downstairs and saw the victim, who was making a telephone call and looked "terrified." When she got off the phone, she told him that a man had raped her as she was leaving the store. The witness testified that he took the victim back to the store with him because she told him that the man was still there. The victim's father and stepmother reached the store at about the same time as he and the victim, and the victim pointed to the defendant, telling her father, "[D]ad, there he goes right there." At that point, the witness ran across the

street to contact some police officers who were at a fast food restaurant. On cross-examination, he testified that he did not hear any screaming from the street that night.

The fiancée of the victim's father testified that she was with the victim's father on the evening of January 20, 2012, when he received a telephone call from the crying victim. She recounted how she and the victim's father drove to the victim's house, found her walking down the street with her uncle, picked her up in their vehicle, and drove her to the store, where she identified the defendant as the man who had just raped her. She testified that the defendant reacted by claiming that he had just paid the victim $20 to let her "suck [his] d***," which caused the victim's father to take a swing at him. She said that the defendant swung back at the victim's father before making a motion as if he was "going in his pocket for something." At that point, she instructed the victim's uncle to go across the street for the police and the defendant fled the store.

The victim's father testified that he and his fiancée left immediately for his father's home, calling 911 en route, after he received a telephone call from the crying victim on the evening of January 20, 2012. They arrived four or five minutes later, saw the victim walking to the store with her uncle, picked her up, and took her to the store, where she pointed to the defendant and said, "[T]here he go, right there." The witness testified that the defendant blurted out that he had given the victim twenty dollars to "suck [his] d***" and that he reacted by swinging at the defendant, but missing. He said the defendant swung back at him before running out the door and down the street toward a neighborhood house.

Officer Jason Craig of the Memphis Police Department testified that he was in the parking lot of the Kentucky Fried Chicken restaurant on the evening of January 20, 2012, when individuals flagged him down to report the victim's rape. A couple of days later, he and a fellow officer canvassed the area with photographs made from the surveillance tape, learned where the defendant lived, and spoke with a man in a neighborhood house who provided them with the defendant's name, date of birth, and telephone number, which he, in turn, relayed to Sergeant Birk. On cross-examination, Officer Craig acknowledged that there was a lot of foot and vehicular traffic in the area surrounding the grocery store and the abandoned house, that he did not hear any screaming or yelling from the area as he was in the fast food parking lot, and that no one he spoke to reported having heard any yelling that night.

Officer Mujahed Abdellatif, who was with Officer Craig when the defendant's uncle provided them with the defendant's name and telephone number, testified that he called that number, identified himself, and asked the man who answered if he was "Joey." When the defendant answered that he was, he told him that they were investigating a rape in which his name had come up. At that point, the defendant blurted out, "I didn't rape that girl, she let

me do it for twenty dollars." Officer Abdellatif stated that he told the defendant that he needed to turn himself in to give his side of the story. He said the defendant replied that he would be in the Lamar and Sims area within half an hour to turn himself in, but he failed to show. At 10:30 that night, Officer Abdellatif was at home off-duty when his telephone rang with a call from the defendant's number. He answered, and the caller identified himself as the defendant and told him that he was in front of the jail ready to turn himself in. Officer Abdellatif testified that he informed someone of the defendant's presence at the jail and remained on the phone with the defendant, who told him that two detectives were walking up to him. He said he instructed the defendant to identify himself to the detectives and announce that he was there to turn himself in. He stated he heard the defendant say, "My name is Joey," before the telephone went dead.

Sergeant Steve Kent of the Memphis Police Department's Felony Response Unit testified that as he took the defendant into custody, he said, "[T]hat girl is trying to put something on me." The defendant also mentioned that he had already talked to Officer "Moe" on the telephone, which, according to Sergeant Kent, was the name that Officer Abdellatif went by.

Sergeant Sharon Birk of the Memphis Police Department's Sex Crimes Unit essentially reiterated her testimony from the suppression hearing about her investigation of the case, including how she took statements from the victim and her relatives on the night of the rape and from the defendant on the day after he had turned himself in at the jail. She identified the defendant's statement, which reads in pertinent part:

> [The victim] was already outside the store talking to some other guys. I went in the store and to some cigars. I came back out and she asked me for twenty dollars. I told her "I ain't got shit for no B****." Then I talked bad to her and she said "I got you." I didn't think nothing of it. I walked on down Kimball. I went in the house on Kimball my friend William McKenzie's house and hung out for about five or ten minutes. Then I went back up to store with a guy named Kenya. I said come on main I will b[u]y you some beer and then got some more cigars. Then about ten minutes later the broad came in with another female and she said that him, the man that raped me. I said "B**** you got me f***** up. You round here sucking d*** for twenty dollars." Then the other lady said that's o.k. cause the police on the way. I said "call the police." Then I walked around about two or three seconds and I thought these folks trying to get me f***** up. So I got on down.

In the statement, the defendant denied that he had any kind of sexual encounter with the victim. He said he could not remember if the victim asked any of the other men for

twenty dollars because he was "kind of high" on marijuana and alcohol. He did not, however, believe he was "that f***** up" that day.

On cross-examination, Sergeant Birk acknowledged that she did not locate any witnesses to the abduction or rape.

Dr. Amanda Taylor, the sexual assault nurse examiner at the Shelby County Rape Crisis center who conducted the physical examination of the victim, read the statement the victim gave her about the attack, which was essentially consistent with her trial testimony and her statement to Sergeant Birk. Dr. Taylor testified that the victim complained of pain in her genital area and that her physical examination revealed "multiple perianal tears with active bleeding," which in her experience were consistent with penetration. On cross-examination, she testified that she found no marks or injuries on the victim's wrists, waist, shoulders, or back.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Lawrence James, who performed the DNA analysis of samples submitted in the case, testified that the victim's anal swabs and clothing were negative for semen. He said he found sperm cells on the swabs taken from the victim's right hand, but there were not enough to obtain a DNA profile.

The defendant elected not to testify and rested his case without presenting any evidence. Following deliberations, the jury convicted him of the aggravated rape of S.K., the false imprisonment of S.K., the aggravated sexual battery of S.K., and the especially aggravated kidnapping of C.H. The trial court merged the false imprisonment count into the aggravated rape count of the indictment and sentenced the defendant to an effective term of thirty-seven years at 100% in the Department of Correction.

## ANALYSIS

### I. Denial of Motion to Suppress

The defendant first contends that the trial court erred by denying his motion to suppress his statement to police, arguing that it was obtained in violation of his right to be free of unreasonable searches and seizures. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a

suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant argues that his statement was the product of an unreasonable seizure because he was held for approximately sixteen hours on an "investigatory detention" before being interrogated by Sergeant Birk. The defendant further argues that his statement, which was made after he had been in a coercive environment for sixteen hours without an attorney or a probable cause determination, was involuntary. The State argues that the trial court properly overruled the motion to suppress after finding that the statement was voluntary and that probable cause existed for the defendant's arrest at the time he turned himself in to the police. We agree with the State.

Both the United States and Tennessee Constitutions offer protection from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. An officer may arrest a person without a warrant when the officer has probable cause for believing that the person has committed a felony. See Tenn. Code Ann. § 40-7-103(a)(3); State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982). For probable cause to exist, the facts and circumstances as they are known to the officer at the time of the arrest must be "'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

The defendant relies on this court's opinion in State v. Courtney Bishop, No. W2010-01207-CCA-R3-CD, 2012 WL 938969 (Tenn. Crim. App. Mar. 14, 2012), perm. app. granted (Tenn. Aug. 15, 2012), to argue that his statement should have been suppressed because he was detained for investigative purposes, and without probable cause, in violation of both the state and federal constitutions. In Bishop, this court, not for the first time, criticized the Memphis Police Department's apparently now-abandoned practice of placing suspects on a "forty-eight-hour hold" for the purposes of conducting further investigation to find probable cause for an arrest, holding that such a practice is "patently unconstitutional and subjects any evidence acquired to suppression." Id. at * 9. After reviewing the facts of the case, the Bishop court concluded that Bishop's seizure and detention were illegal because the police lacked probable cause for an arrest at the time they placed him under the "48-hour hold." The court further concluded that Bishop's statement was the product of the illegal detention and should, therefore, be suppressed. Id. at *10-12.

In this case, by contrast, there was probable cause for the defendant to be placed under

formal arrest at the time the felony response officer took him into custody. The victim had identified her rapist at the store and police officers canvassing the neighborhood with photographs made from the store surveillance camera had already tracked down the defendant's uncle and from him learned the defendant's identity. The defendant had, additionally, identified himself as the suspect when he turned himself in by claiming that the victim was trying to frame him. We conclude, therefore, that the evidence does not preponderate against the trial court's finding that the officers had probable cause to arrest the defendant at the time he was placed under the police department's "48-hour hold."

We further conclude that the evidence does not preponderate against the trial court's finding that the defendant's statement was voluntary. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

Here, the defendant voluntarily surrendered to the police after learning they were looking for him in connection with the rape. Despite the fact that he was not formally arrested at the time he was taken into custody, probable cause for his arrest existed, and he was advised of his rights and waived his rights to an attorney and to remain silent before giving his version of what transpired with the victim. We, therefore, conclude that the trial court properly overruled the defendant's motion to suppress his statement.

## II.  Testimony by Officer Abdellatif

The defendant next contends that the trial court erred by allowing the testimony of Officer Abdellatif.  He argues on appeal, as he did at trial, that the evidence should have been excluded both because Officer Abdellatif failed to authenticate the identity of the person he spoke with on the telephone and the State violated discovery rules by not providing defense counsel with timely pretrial information about the evidence.  The State responds by arguing that the trial court acted within its discretion in admitting the testimony after finding that there was no discovery violation, that the defendant was not prejudiced by the admission of the evidence, and that there was no authentication issue.

This issue arose because the prosecutors added Officer Abdellatif as a witness just before the start of trial.  On the first day of trial, defense counsel moved for the court to exclude Officer Abdellatif's testimony, arguing that he was not listed as a witness or mentioned in discovery materials provided by the State and that his account that the defendant claimed to have engaged in consensual sexual relations with the victim, which was "completely at odds" with his statement, amounted to "an ambush of [their] case."  The prosecutor pointed out that defense counsel had been provided in discovery with Sergeant Birk's supplemental report, in which she mentioned that Officer Craig reported that the defendant had communicated with another officer by telephone about wanting to turn himself in.  The prosecutor explained that her colleague had learned the identity of Officer Abdellatif during her interview with Officer Craig and that they had just located and interviewed Officer Abdellatif on the Friday before the Monday start of the trial.

The trial court noted that "other names" do "pop up" during the preparation for trial and that it had not yet heard anything about the late notice of the witness that would change anything about the defendant's case.  The trial court reserved its final ruling, however, until after defense counsel had a chance to interview the witness the following morning.  The following morning, defense counsel renewed his objection to Officer Abdellatif's testimony on the basis of the discovery violation and the lack of authentication of the defendant's voice.  The trial court stated that it did not find any discovery violation that warranted excluding the witness's testimony and that it would reserve its ruling on the authentication issue until after holding a jury-out hearing before the witness was scheduled to testify.  The court also ordered that the parties refrain from mentioning the witness during opening statements.

Officer Abdellatif's testimony during the jury-out hearing was essentially the same as his trial testimony.  At its conclusion, the trial court reiterated its ruling with respect to the defendant's complaint about the alleged discovery violation, finding that the witness's testimony was "basically cumulative" to the testimony by other witnesses, was not devastating, and would not have changed the defendant's preparation for his defense other

-12-

than adding another witness. The trial court also overruled the defendant's authentication objection to the testimony, finding that "it's not a matter of admissibility here, it's just a matter of weight."

We find no abuse of discretion in the trial court's rulings on these issues. As the State points out with respect to the authentication issue, the contested evidence consisted not of a recording of the defendant's telephone conversation with Officer Abdellatif, which would require authentication for admission, but instead of the officer's account of what the person who identified himself as the defendant told him. As for the discovery issue, we agree with the trial court that Officer Abdellatif's testimony was cumulative to that of multiple other State witnesses and that there was, thus, no discovery violation that warranted the exclusion of the evidence. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

### III. Sufficiency of the Evidence

Lastly, the defendant challenges the sufficiency of the evidence in support of his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a

written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Aggravated Rape of S.K.

For the purposes of this case, aggravated rape is unlawful sexual penetration of a victim by the defendant in which the defendant causes bodily injury to the victim. See Tenn. Code Ann. § 39-13-502(a)(2) (2010). The State elected the incident of penile-anal intercourse for the aggravated rape count of the indictment. Thus, to sustain the conviction, the State had to prove beyond a reasonable doubt that the defendant penetrated S.K.'s anus with his penis, causing bodily injury to her.

The defendant concedes that S.K. sustained bodily injury but argues that the State failed to prove the element of penetration beyond a reasonable doubt. In support, he cites S.K.'s testimony that the defendant "stuck his vagina in [her] butt," along with her clarification that the part of the anatomy she was calling the defendant's "vagina" was his "middle part." The defendant asserts that such terminology was "vague and ambiguous" because the word "vagina" was not "appropriate" and "[t]here was no explanation as to what she meant by 'middle part.'" We respectfully disagree. It is obvious that S.K.'s mistake in terminology resulted from the fact that she was attempting to use, in her trial testimony, anatomical terms that were unfamiliar and unnatural to her. This was made even clearer during the testimony of the sexual assault nurse examiner, who read aloud to the jury the statement about the attack that S.K. provided her, including the exact words S.K. used and the clarification she had sought from her about the meaning of those words. Thus, according to her report, the victim referred to her vagina as her "stuff," the defendant's penis as his "thing," her breasts as her "titties," and her anus as "that little circle hole back there." The sexual assault nurse examiner also testified that the victim's anus had active, bleeding tears that were consistent with penetration. We conclude, therefore, that the evidence is more than sufficient to sustain the defendant's aggravated rape conviction.

## B. False Imprisonment of S.K.

The defendant contends that the evidence is insufficient to sustain his conviction for

-14-

the false imprisonment of S.K. because there was no proof that he forced, threatened, or induced her by fraud to follow him behind the abandoned house. The defendant asserts that she "could just as easily have run home and called the police" when he grabbed C.H. and that she "chose" to go with him. The State argues the jury could have reasonably found that S.K. was compelled to submit to the defendant's interference with her liberty by his use of threats and force against her young cousin, C.H., whose welfare was her responsibility. We agree with the State.

"A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2010). "'Unlawful' means, with respect to removal or confinement, one that is accomplished by force, threat, or fraud[.]" Id. § 39-13-301(16).

S.K. testified that she followed the defendant in an attempt to wrest her two-year-old cousin, C.H., from his grasp after he grabbed C.H. by the collar and began dragging her behind the abandoned house. Thus, from the evidence, the jury could have reasonably found that the defendant removed or confined S.K. so as to substantially interfere with her liberty and that his removal and confinement was accomplished by his use of force or threats against C.H. We conclude, therefore, that the evidence is sufficient to sustain the defendant's false imprisonment conviction.

### C. Aggravated Sexual Battery of S.K.

The defendant contends that the evidence is insufficient to sustain his conviction for the aggravated sexual battery of S.K. because her vaginal and anal injuries were inconsistent with "[t]he event giving rise to this charge," which, he asserts, was the victim's testimony that the victim put her hand on his "middle part." The State disagrees, pointing out, correctly, that it elected for this offense to rely on the proof that the defendant digitally penetrated the victim's vagina.

To sustain the aggravated sexual battery conviction, the State had to prove beyond a reasonable doubt that the defendant engaged in unlawful sexual contact with the victim and that his unlawful sexual contact caused bodily injury to the victim. Tenn. Code Ann. § 39-13-504(a)(2). "Bodily injury" includes physical pain. Id. § 39-11-106(a)(2). The victim testified that the defendant inserted his finger into her vagina, which "[f]elt awful." She also complained to the sexual assault nurse examiner of pain in her genital area. This evidence was sufficient for the jury to find beyond a reasonable doubt that the elements of aggravated sexual battery were met by the defendant's actions. We conclude, therefore, that the evidence is sufficient to sustain the defendant's aggravated sexual battery conviction.

### D. Especially Aggravated Kidnapping of C.H.

Finally, the defendant contends that the evidence is insufficient to sustain his conviction for the especially aggravated kidnapping of C.H., arguing that there was no evidence that he used any force or threats to confine her to the steps behind the abandoned house. The State disagrees, pointing to the testimony that the defendant dragged C.H. by her collar behind the house and, once there, physically prevented her from leaving when she tried to run away. Once again, we agree with the State.

To sustain the conviction for especially aggravated kidnapping, the State had to prove beyond a reasonable doubt that the defendant knowingly removed or confined C.H. unlawfully so as to interfere substantially with her liberty and that C.H. was a child under the age of thirteen. Tenn. Code Ann. §§ 39-13-302; -305(a)(2). During her testimony, S.K. described how the defendant grabbed C.H. by the collar, dragged her behind the abandoned house, placed her on top of a step, and caught and returned her to the step when she tried to run away. This proof was more than sufficient for the jury to find that the defendant used force to remove and confine C.H. We conclude, therefore, that the evidence is sufficient to sustain the defendant's especially aggravated kidnapping conviction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE